## In re SIEGEL-HILLMAN DRY GOODS CO.

(District Court, E. D. Missouri, E. D. December 4, 1901.)

1. BANKRUPTCY—EQUITY POWERS OF COURT—ADJUSTMENT OF EQUITIES BETWEEN CREDITORS.

A district court sitting in bankruptcy can exercise the full powers of a court of equity for the ascertainment and enforcement of the rights and equities of the various parties interested in the bankrupt estate, and the adjustment of equities between creditors arising out of the provisions of the bankruptcy act is peculiarly within the rule requiring the exercise of such powers.

SAME—SURRENDER OF PREFERENCES.

A bank held notes of a corporation, indorsed before delivery by a partnership, which thereby became liable as a joint maker. A short

time before the corporation became bankrupt, and while insolvent, it made a payment on the notes, which was received by the bank in the usual course of business, and without notice, actual or constructive, of the corporation's insolvency. After the bankruptcy the indorser paid the remainder due on the notes. Both the bank and the partnership held other large claims against the bankrupt estate. *Held*, that if the bank was required, under the provisions of the bankruptcy act, to surrender the payment received from the corporation as a condition precedent to proving its remaining claims against the estate, the effect would be to leave the notes to that extent unpaid, and a subsisting liability not only of the estate, but also, in equity, of the partnership, as indorser, and that the court of bankruptcy, in the exercise of its power to adjust the equities between such creditors, would transfer the obligation to surrender the amount of such payment from the bank to the partnership, as a condition to the proving of its remaining claims; the circumstances of the particular case being such that the rights of general creditors would not be affected thereby.

**8. SAME—PROOF OF CLAIM BY INDORSER.**

An indorser of notes of a bankrupt given to a bank, who pays the same after the bankruptcy, thereby extinguishing the claim of the bank as a creditor of the estate, cannot be required, as a condition precedent to the proving of his claim on such notes, to surrender to the trustee an amount paid by the bankrupt while insolvent, and a short time before the bankruptcy, in full satisfaction of other notes given to the bank as a separate transaction, although the claimant was also indorser on such notes, where the payment was received under such circumstances that it could not be recovered from the bank.

In Bankruptcy. On exceptions to finding and ruling of referee with respect to claims of the Fourth National Bank of St. Louis and of F. Siegel & Bro.

Sale & Sale, for Bank.

Abbott & Edwards and David Goldsmith, for trustee.

Stewart, Cunningham & Eliot, for F. Siegel & Bro.

SHIRAS, District Judge. From the record certified to by the referee in this case, it appears that the Siegel-Hillman Dry Goods Company, a corporation created under the laws of the state of Missouri, was on the 6th of February, 1900, adjudged to be bankrupt, upon a petition filed by creditors under date of December 30, 1899. On March 7, 1900, the Fourth National Bank of St. Louis presented and secured the allowance of a claim in the total sum of $35,246.56, represented by several promissory notes of the corporation; and F. Siegel & Bro. on the same date secured the allowance of several claims, amounting in all to the sum of $32,287.54. Subsequently the trustee filed before the referee petitions praying for an order setting aside the allowance of these claims, mainly on the ground that the parties had received preferential payments from the bankrupt after the date of its insolvency, which they had not accounted for, and upon the hearing before the referee the facts were shown to be as follows: The claim proven up by the Fourth National Bank was for money loaned the bankrupt company, and was evidenced by six promissory notes (five for $5,000 each, and one for $10,000) executed by the bankrupt, and indorsed by B. Hillman and H. A. Loeb, who were officers of, and stockholders in, the corporation. It further appeared that during the month of De-

cember; 1899, there had been paid in money to the bank by the dry goods company sums aggregating $14,600, which were applied in part payment of other notes, amounting to $25,000, held by the bank, and which were indorsed by B. Hillman, H. A. Loeb, L. Regenstein, and F. Siegel & Bro.; these payments being all made after the actual insolvency of the corporation, but while it was yet conducting its business; the fact of insolvency being unknown to the bank. Under these facts the referee entered an order to the effect that unless the bank paid to the trustee, within 30 days, the sum of $14,600, the claim of the bank should be expunged and disallowed, but, if repayment of the sum named should be made, then the claim should be allowed in the sum of $49,846.56. With respect to the claims allowed in favor of F. Siegel & Bro., it appears that they embrace a claim of $4,142.75 for goods sold the bankrupt company; a claim of $1,869.67 for rental paid by Siegel & Bro. to the lessors of the premises occupied by the bankrupt company, who held under an assignment of a lease originally executed to Siegel & Bro., and by them assigned to the company; of a claim of $2,792.30 for taxes paid by Siegel & Bro., assessed against the property embraced within the lease assigned as above stated; of a claim for $17,609.33 moneys paid by Siegel & Bro. to the Corn Exchange Bank of New York in the month of January, 1900, to take up notes held by that bank, executed by the bankrupt company, and indorsed by Siegel & Bro.; and of a claim for $10,535.41 for moneys paid on February 21, 1900, by Siegel & Bro. to the Fourth National Bank of St. Louis, to take up two notes, of $5,000 each, and a further note of $5,000, on which was due the sum of $400, all executed by the bankrupt company, and indorsed by Siegel & Bro. Upon the hearing the referee found and held that the claim for the rental paid, amounting to $1,869.67, was not a provable claim against the estate, in that it was rent accruing for the period from January 12, 1900, to February 1st, covering a period when the premises were not in the possession of the bankrupt company, and in that the trustee never occupied the premises and never assumed the lease. The referee further found that after the insolvency of the company it had paid to Siegel & Bro. sums aggregating $5,219.63, and therefore ordered that, unless this sum should be repaid to the trustee within 30 days, the entire claim should be disallowed, but, if this amount should be repaid to the trustee, then the claim would be allowed in the sum of $40,811.65, which amount includes all the items of the original claims, except that for rental. The claimants and the trustee, also, except to the ruling and order, and the several matters thus presented have been certified to this court for its decision; Siegel & Bro. claiming that the referee erred in expunging the claim based upon the rental paid, and in holding that the payment of the sums aggregating $5,219.63 were preferential, and must be repaid as a condition to the allowance of any claim in their behalf; and the trustee claiming that the referee erred in refusing to find that Siegel & Bro. were the parties benefited by the payments to the Corn Exchange Bank and the Fourth National Bank of St. Louis, and in refusing an order requiring

the repayment of these amounts to the trustee as a condition to the allowance of any claim on behalf of Siegel & Bro.; and the Fourth National Bank claiming that it was error to hold it responsible for the repayment of the $14,600, instead of placing this obligation on Siegel & Bro.

This court, sitting in bankruptcy, can exercise the full powers of a court in equity for the ascertainment and enforcement of the rights and equities of the various parties interested in the estate of the bankrupt company. So far as the questions now presented are involved, the parties interested therein are the general creditors, represented by the trustee, the Fourth National Bank, and Siegel & Bro. The attention of counsel, in their argument, has been mainly devoted to the questions arising on the ruling of the referee with respect to the payment of the sum of $14,600 to the Fourth National Bank upon the notes for $25,000 indorsed by Siegel & Bro.; it having been held by the referee that these payments were preferential, and that the bank must repay them to the trustee, or be precluded from proving up its claim against the estate. It is not questioned that in fact these payments, aggregating $14,-600, were all made after the insolvency of the company, and therefore the trustee, representing the general creditors, has the right to insist that the one receiving the preference shall not be allowed to further participate in the distribution of the estate, unless the preference received shall be surrendered, as required by clause "g" of section 57 of the bankrupt act. The general creditors, however, in cases wherein the preferential payments, as in this case, were made in the ordinary course of business, and without knowledge on part of the creditor of the insolvency of the debtor, are not entitled to demand the repayment of the money. Under these circumstances, the preferred creditor has the option given him of surrendering the preferences received, and then sharing in the estate, or of retaining the preference, and being debarred from proving his claim. The equity and right of the general creditors consist in securing one or the other of these results, to the end that the shares or dividends coming to them shall be increased either through the addition to the assets of the estate of the sum surrendered, or, if the preferential payment is not surrendered, then by means of lessening the amount of provable claims. While this right of the general creditors must be observed and be fairly protected, yet it does not prevent the court from determining in each case what may be the equities of parties interested in the same claims, and upon which one rests the ultimate duty of surrendering a preference as a condition to the allowance of a further claim against the estate. In the present case it is shown that the Fourth National Bank loaned to the bankrupt company the sum of $25,000 upon its notes secured by the indorsement of Siegel & Bro. Upon these notes during the month of December, 1899, there was paid to the bank by the maker of the notes sums aggregating $14,600. Subsequent to the initiation of the proceedings in bankruptcy Siegel & Bro. paid to the bank the balance due on the notes for $25,000, and the payment thus made forms a large part of their claim against the estate.

If the bank had not received the payments of $14,600, it would have held Siegel & Bro. for the entire sum due on the notes for $25,000; and, as Siegel & Bro. are shown to be solvent, there can be no reasonable doubt that they would have paid the entire amount to the bank, instead of the balance left after deducting the $14,600 received by the bank. In that event they would have had the right to prove up the entire amount of the notes against the estate, and the result would have been that the bank would have been paid the full amount of the notes by Siegel & Bro. and the latter would have the right to prove up the entire amount as a claim against the estate. If the bank is now compelled to repay the $14,600 received and applied in part payment of the notes on which Siegel & Bro. were liable, one of two results must follow: The bank must be deprived of the difference between the amount and the dividend received hereafter thereon, or else it must be held that the bank can recover from Siegel & Bro. the amount of this loss. Is there any good reason why, as between the bank and Siegel & Bro., the loss should fall on the former? The facts show that the bank extended the credit of $25,000 to the bankrupt company on the security afforded by the indorsement of the notes by Siegel & Bro. The latter were absolutely bound to the bank for the payment of the entire sum, but the entire amount thereof was not demanded by the bank when payment was made them by Siegel & Bro., for the reason that it had received from the maker of the notes the sum of $14,600. It now appears that under the provisions of the bankrupt act these sums must be surrendered, or the bank will be debarred from proving up its claim. This situation is not caused through any fault or by reason of any act on the part of the bank. When these payments were made the dry goods company was carrying on its business in the usual manner, and the bank had no notice, actual or constructive, of its insolvent condition. Siegel & Bro. were relieved from the payment of the full amount of the notes indorsed by them upon the assumption that the bank had received part payment thereof from the maker of the notes. It now appears that the sums so received by the bank cannot be retained by the bank without causing the forfeiture of the right to prove up its other indebtedness against the estate. In equity, moneys thus received will not be deemed to be a payment upon the debt. There can be no question that, if the bank should now surrender the $14,600 received by it, it can prove up this amount as a debt due it from the dry goods company. In other words, if the bank is compelled to surrender this money to the trustee, the debt due the bank from the dry goods company will not have been paid or discharged; and if, under such circumstances, the maker of the notes is bound, why is not the surety thereon equally bound? No good reason is perceived why the surety should be released from liability for the unpaid portion of the debt evidenced by the notes indorsed by the surety, if the circumstances are such that the maker of the notes is still liable. It certainly would be most inequitable to hold that the debt due the bank has been discharged by the payment to it of a sum which by the provisions of the bankrupt

act it is now compelled to surrender back to the estate, or else to forfeit all right to a share of the estate as dividends upon the other claims it holds against the bankrupt. If, in order to secure a dividend on the claims due it, the bank is now compelled to surrender the moneys received, then in equity it must be held that the moneys so received and surrendered did not pay or discharge the debt due the bank, but the same will continue to be due and enforceable against the parties originally liable therefor. Bartholow v. Bean, 85 U. S. 635, 21 L. Ed. 866. This being the situation, it is thus made to appear that Siegel & Bro. are the parties who, as between themselves and the bank, are ultimately liable to account for any portion of the $25,000 debt due the bank. In other words, if the bank, in obedience to the order made by the referee, should surrender to the trustee the $14,600 received from the dry goods company, then in equity it would be entitled to enforce payment of this sum from Siegel & Bro. This money was paid to and received by the bank for the common benefit of itself and of Siegel & Bro., in that the payment thereof was supposed to defray so much of the indebtedness to the bank, and thereby relieve Siegel & Bro. from liability therefor. It appearing, however, that the circumstances are such that the bank, without fault on its part, is under obligation to surrender the money to the trustee, thus reviving its claim against the dry goods company, no good reason, either at law or in equity, is perceived why the claim of the bank is not also revived against all the parties originally liable to it. The evidence shows that Siegel & Bro. were not named as payees of the notes given to the bank, but wrote their names on the notes before the delivery thereof to the bank, and became practically joint makers thereof, under the rule recognized in this state. Powell v. Thomas, 7 Mo. 440, 38 Am. Dec. 465; Otto v. Bent, 48 Mo. 23; Cahn v. Dutton, 60 Mo. 297. Holding, then, that, in case the bank should surrender the $14,600 received by it to the trustee, the claim of the bank for that amount would be revived against Siegel & Bro., as well as against the dry goods company, is it not within the power of the court, acting as a court of equity, to make such orders in the premises as will settle and enforce the rights of the bank, as well as those of the trustee, and thus save all further litigation and expense between the parties? The power of the court of equity in such cases is well stated in Riddle v. Mandeville, 5 Cranch, 322, 3 L. Ed. 114, wherein Mr. Chief Justice Marshall, speaking for the court, said:

"But the real questions in the case are understood to be whether the plaintiffs, as indorsees of a promissory note, have a right, under the laws of Virginia, to receive its amount from the indorser, on the insolvency of the maker; whether the defendants, as the original indorsers of the note, are ultimately responsible for it; and whether equity will decree the payment to be immediately made, by the person ultimately responsible, to the person who is actually entitled to receive the money. * * * The maker having proved insolvent, the plaintiffs have a legal right to claim payment from McClenachan, and, on making that payment, McClenachan would be reinvested with all his original rights in the note, and would be entitled to demand payment from Mandeville & Jameson. If there were twenty successive indorsers of a note, this circuitous course might be pursued, and by the time

the ultimate indorser was reached the value of the note would be expended in the pursuit. This circumstance alone would afford a strong reason for enabling the holder to bring all the indorsers into that court which could in a single decree put an end to litigation. No principle adverse to such a proceeding is perceived. Its analogy to the familiar case of a suit in chancery by a creditor against the legatees of his debtor is not very remote. If an executor shall have distributed the estate of his testator, the creditor has an action at law against him, and he has his remedy against the legatees. The creditor has no action at law against the legatees. Yet it has never been understood that the creditor is bound to resort to his legal remedy. He may bring the executor and legatees both before a court of chancery, which court will decree immediate payment from those who are ultimately bound. * * * The right of the executor, however, may, in a court of equity, be asserted by the creditor; and, as the legatees would be ultimately responsible for the debt, equity will make them immediately responsible."

The ruling in this case justifies the holding that in cases wherein a court of equity is charged with the distribution of an estate or a fund under its control, and has before it the several parties whose rights and interests are involved in the administration of the estate, it may, disregarding mere matters of form, but having regard to the substantial rights of all the parties, ascertain the ultimate relation and liability of the several parties, and base its decree thereon, thus avoiding the delay and expense which would be caused if the parties were remitted to the pursuit of their legal rights without aid from a court of equity. Cases in bankruptcy, such as that now before the court, are peculiarily within this rule, and call for the exercise of the full powers of the court for the ascertainment and proper enforcement of the equities of the parties; for in no other proceeding can these equities be so well determined and protected as in the bankruptcy proceedings, wherein the court is called upon to enforce the provisions of the act, which provisions largely control the rights of the parties. Viewing the question now under consideration in this light, there seems to be no good reason why the court cannot adjudge the rights and equities between the Fourth National Bank and Siegel & Bro., growing out of their connection with the indebtedness evidenced by the notes on which the bankrupt company and Siegel & Bro. were bound to the bank; and, it appearing that in fact Siegel & Bro. are equitably bound to the bank for the payment of the whole of this indebtedness, there is no good reason why, so far as these parties are concerned, the court should not now place the obligation to return the $14,600 on Siegel & Bro., rather than to place it on the bank, and then remit the bank to its right to recover the amount from Siegel & Bro. A decree to this effect will not affect injuriously the rights of the general creditors represented by the trustee. If the named amount of $14,600 is repaid to the trustee, it is matter of indifference to the general creditors by whom the repayment is made; and, if the sum is not repaid, then the right of the creditors consists in debarring the creditor, upon whom the duty of repaying the amount rests, from sharing in the estate. The conclusion reached on this branch of the case, therefore, is that the order made by the referee requiring the Fourth National Bank to repay the sum of $14,600 as a condition to being allowed to prove its claim must be set aside, and

in lieu thereof it must be ordered that Siegel & Bro. repay this amount, or be debarred from proving their claim against the estate.

The next question for consideration is that arising on the contention of the trustee that Siegel & Bro. should be required to pay to the trustee the sum of $20,000, being the total of the amounts paid to the Corn Exchange Bank by the bankrupt company within four months of the adjudication in bankruptcy, and after the actual insolvency of the dry goods company, and which payments discharged the notes of the bankrupt company discounted by the Corn Exchange Bank, and upon which Siegel & Bro. were sureties. In this transaction the Corn Exchange Bank was the real creditor of the dry goods company. The debt due the bank has been discharged in full, and the bank is not now a creditor of the bankrupt estate. The evidence does not show, nor is it claimed by the trustee, that a recovery could be had against the Corn Exchange Bank for the moneys paid it, for the reason that when the payments were made the bank did not have reason to know that the dry goods company was in fact insolvent. When payments are made to a creditor by an insolvent debtor, but the creditor does not know or have cause to know of the insolvency of the debtor, the trustee, representing the general creditors, cannot recover back the moneys thus paid; and the preferred creditor may retain the sum paid, provided he does not seek to further share in the distribution of the estate. In this case, therefore, as the Corn Exchange Bank does not seek to participate in the estate, it can rightfully hold the sums paid it; and there is no ground for holding that Siegel & Bro. should be subjected to the burden of paying to the trustee this amount of $20,000, as a condition to obtaining their share of the estate upon the indebtedness due them from the bankrupt company. No part of the sum in question was paid to or received by Siegel & Bro. True, they were benefited by the payments made to the bank, in that these payments discharged the debt upon which they were sureties; but it would be most inequitable to hold that a surety may be held accountable for moneys paid the principal creditor under circumstances enabling the latter to hold the sum received against the claims of the general creditors. Under the provisions of the bankrupt act, the sums paid to the Corn Exchange Bank were received by it under circumstances which do not entitle the general creditors to recover the same back again, and, the situation being such that the bank cannot be required to repay the amount received by it, certainly Siegel & Bro. cannot be required to pay the same, when they in fact never received a dollar thereof. The facts of the case do not bring it within the rule recognized in Re Schmechel Cloak & Suit Co. (D. C.) 104 Fed. 64, wherein it was ruled by Judge Philips that where a surety pays the claim, and then, availing himself of the right of subrogation, seeks to prove this claim against the estate, he must repay the sums received on the debt by the original holder thereof, as a condition to the allowance of the claim. In the case now before the court Siegel & Bro. are not seeking to be subrogated to the rights of the Corn Exchange Bank as the original owner of the note for

$20,000 upon which Siegel & Bro. were indorsers, and which notes were paid in full by the dry goods company. It is true that part of the claim filed by Siegel & Bro. consists of the sum of $17,500 by them paid to the Corn Exchange Bank to take up two notes (one for $10,000 and one for $7,500) executed by the dry goods company, and indorsed by Siegel & Bro.; but this payment was made after the filing of the petition in bankruptcy, and upon notes separate and distinct from those paid by the bankrupt company, and it certainly cannot be true that a surety will be debarred from proving up a claim for money paid in discharge of a debt owing primarily by the bankrupt, unless the surety pays to the estate all the moneys received by the original creditor since the insolvency of the debtor, and applied in payment of claims other than the one under which subrogation is sought by the surety claimant. It would certainly work great injustice if it should be held in cases wherein a surety pays up a claim in full, and thus in fact becomes a creditor of the original debtor for the sum thus paid, that he cannot prove the debt thus due him unless he repays to the trustee all sums received by the original creditor, amounting, perhaps, to many times the debt due the surety. Are not the rights of the general creditor sufficiently protected by holding that a surety is only required to account for the payments made on the particular claim upon which he was a surety, and not for all sums received by the original creditor? It is a question, upon which no opinion is now expressed, whether the clause of section 57 of the act, which provides that "whenever a creditor, whose claim against a bankrupt estate is secured by an individual undertaking of any person, fails to prove such claim, such person may do so in the creditor's name, and if he discharge such undertaking in whole or in part he shall be subrogated to that extent to the rights of the creditor," can be held applicable to a case wherein a surety pays the debt owing by the bankrupt to a third party, and then seeks to prove the claim inuring to him by reason of the fact that he has paid a given sum of money for the use and benefit of the original debtor, or whether this clause is not to be confined solely to cases wherein the surety proves up the claim in the name of the original creditor, it being still the property of the latter, or possibly to cases wherein the surety relies upon the rights created by the note or other instrument evidencing the original debt, and therefore in fact places himself in the legal position occupied by the original holder of the instrument. If the surety does not seek to prove up the claim in the name of the original creditor, and does not seek to avail himself, by way of subrogation, of any advantages connected with the debt as it existed between the original creditor and the bankrupt, but simply pays the debt of the bankrupt, for which he was surety, and thus becomes in fact a creditor of the bankrupt for the sum thus paid, it certainly is a debatable question whether his rights are to be limited by the provisions of section 57, providing for subrogation, or whether the rights of the surety are not to be considered solely in connection with the debt upon which he is liable. There is equity in the holding that where a claim secured by an

indorser or accommodation maker is partly paid to the original creditor after the insolvency of the real debtor, and then the surety paying the balance seeks to prove up a claim against the estate for the amount paid by him, he should account for the sums paid on the claim after insolvency, as in that event the surety received the benefit of the sums thus paid on the debt for which he was surety; but surely it is not equitable to hold that his just claim, created by the payment of money for the benefit of the bankrupt, cannot be allowed him unless he accounts for all the sums which the original creditor would be held to repay in case he was the party in interest. The ruling of the referee on this proposition is therefore affirmed, as well as the rulings to the effect that the claim for rental paid by Siegel & Bro. is not provable in their behalf, and that the moneys paid them on the checks of the dry goods company, amounting to $5,219.63, must be deemed to be preferential payments, which must be surrendered before Siegel & Bro. can further share in the estate. These questions are fully dealt with in the opinion filed by the referee, and it is therefore sufficient to say that the conclusions reached therein by the referee are affirmed.

The case is therefore returned to the referee, with instructions to set aside the orders heretofore entered, and in lieu thereof to enter orders to the effect that the claim of the Fourth National Bank is allowed; that unless Siegel & Bro., within a time to be named in the order, repay to the trustee the sums of $5,219.63 and $14,600, they shall be debarred from proving or being allowed any claim against the estate, but, if they shall repay these sums to the trustee, then their claim, including the sums repaid, shall be allowed in full; and that the costs of this appeal shall be paid out of the estate in the hands of the trustee.